AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
District of New Mexico

| | |
|---|---|
| United States of America<br>v.<br>KEVIN VIGIL<br>YEAR OF BIRTH 1966<br><br>*Defendant(s)* | Case No.<br><br>18mj504 |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of  02/04/2018  in the county of  Rio Arriba  in the
District of  New Mexico , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 18 U.S.C. Section 1152 | Crimes in Indian Country |
| Title 18 U.S.C Section 2241(c) | Aggravated Sexual Abuse with Children |
| Title 18 U.S.C. Section 2246(2)(A) | |

This criminal complaint is based on these facts:
See attached affidavit

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Russell S. Romero, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 2/16/2018

_____
*Judge's signature*

City and state:  Albuquerque, New Mexico     Hon. Laura Fashing, U.S. Magistrate Judge
*Printed name and title*

the United States District Court

District of New Mexico

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| VS. | ) |
| | ) |
| KEVIN VIGIL | ) |
| Year of Birth 1966 | ) |

## AFFIDAVIT

I, Russell Romero being duly sworn, hereby, depose and state as follows:

1. I am a Special Agent (SA) of the Federal Bureau of Investigation (FBI) and have been employed in that capacity since January 2007. I am currently assigned to the Albuquerque Division, Santa Fe Resident Agency of the FBI, and have primary investigative responsibility in violent crimes, to include those occurring in Indian Country such as Homicides and Child Sexual Assaults. The information set forth in this affidavit has been derived from my own investigation or communicated to me by other sworn law enforcement officers.

## PROBABLE CAUSE

2. On or about February 4, 2018, at approximately 3:46am, I received a telephone call from FBI Supervisory Special Agent (SSA) Mark Buie regarding a child sexual assault that had occurred in Indian Country. I was advised to contact Bureau of Indian Affairs (BIA) Special Agent Carleen Fischer for further details.

3. I made contact with BIA SA Fischer who told me that there had been a sexual assault of a six year old Indian girl, AW, Year of Birth (YOB) 2011. The suspect was Kevin VIGIL, YOB 1966, who is a non-Indian. VIGIL is a friend of AW's mother, CW, YOB 1974, and father, TW, YOB 1966, and the assault occurred at VIGIL's residence, which was located off of North McCurdy Road in Espanola, New Mexico, within the exterior boundaries of the Ohkay Owingeh Pueblo, which is Indian Country in the State of New Mexico. The assault had just occurred within the last couple of hours, and BIA SA Fischer advised that CW had witnessed the assault. BIA SA Fischer advised that the family was standing by at the Presbyterian Espanola Hospital (PEH) to take AW to Christus St. Vincent Hospital (CSVH) in Santa Fe for a Sexual Assault Nurse Exam (SANE). BIA SA Fischer advised me to contact Officer Jonathon Cruz from the Ohkay Owingeh Tribal Police Department (OOTPD) for further details.

4. Officer Cruz told me that he had AW and her parents on standby to go to CSVH in Santa Fe to have a SANE conducted. I advised him to send them to Christus St. Vincent. I also advised Officer Cruz to collect AW's clothing as evidence for possible DNA collection and analysis.

5. When I arrived at the hospital, I interviewed CW. The following was obtained from the interview of CW:

6. CW stated that she and her daughter, AW, are registered members of the Ohkay Owingeh Pueblo.

7. Earlier in the evening, CW and TW had been hanging out at Kevin VIGIL's home on Calle Raphael in Espanola, NM. They had been there since Friday night, and, on Saturday, at approximately 1-2pm, had gone to pick up AW at AW's sister's home. After they picked AW up, they returned to VIGIL's home.

8. At approximately 5:00pm, they went to Taco Bell to get supper. At approximately 6:00pm, CW took a shower at VIGIL's residence. After taking a shower, CW bathed AW.

9. After her bath, AW was watching cartoons and later became tired. AW then went to lay down with VIGIL on his bed at approximately 9:30pm. VIGIL had gone to bed approximately 30 minutes earlier.

10. CW had told AW to lay on the couch, but AW was insistent on lying in bed with her "Uncle Kevin."

11. CW went to check on AW at approximately 10:00pm, and saw VIGIL laying on the left side of the bed (when facing the bed), and AW was laying on his right side. CW went to check on AW again at approximately 10:30pm. This time, they were in the same locations; however, VIGIL had his arm around AW and they both were snoring. CW then went back into the kitchen.

12. At approximately 11:30-11:45pm, VIGIL's daughter, TV, YOB 1992, who is approximately 26 years old, arrived at VIGIL's house to clean.

13. At approximately 1:15am, AW woke up and went into the kitchen. Approximately 10 minutes later, VIGIL woke up and also went into the kitchen, where he had a beer and a shot of alcohol with TW.

14. At approximately 2:00am, AW went back to Kevin's room to lie down. Approximately five minutes later, VIGIL said he was going to lay down and also returned to his room.

15. Approximately 10-15 minutes later, CW later got into the bed with AW and VIGIL. AW was laying between CW and VIGIL, and CW was laying on her right side with her back to AW.

16. Approximately three minutes later, CW felt movement with AW that "wasn't right." AW was making noises, and made a noise that CW described as a "gasp to something painful."

17. While still laying on her right side, CW reached back with her left hand and could feel that AW's pants and underwear were pulled down. She could also feel VIGIL's erect penis outside of his shorts. CW did not notice any ejaculate when she felt VIGIL's erect penis.

18. CW then told AW, "Get up, we're going to go!" and pulled AW's pants up. VIGIL asked CW, "What's wrong with you?" CW responded, "Don't play dumb with me; I know what you were doing!"

19. CW turned on the lights and saw VIGIL pulling up his underwear. She got mad and threw the blankets off of the bed. CW did not see VIGIL's penis while he was pulling up his underwear.

20. TW asked CW, "What's wrong? What happened? What's the matter?" CW responded, "We're just leaving!" TW then asked, "Can I go with you guys?" and CW responded, "Yeah, if you're going, let's go." CW, TW, and AW then went to the car and drove to the hospital in Espanola (PEH).

21. CW told TW what had happened after they left VIGIL's residence.

22. On the way to the hospital, AW told CW, "Mom, my cookie hurts!" CW asked, "Why?" AW responded, "He put his fingers in my cookie! I told him to stop, and he said, 'Be quiet!'" AW told CW that he kept sticking his fingers in her, and that it hurt. AW also told CW that VIGIL put his "peepee" in her butt. She said that she had been sleeping, and woke up to VIGIL's fingers inside of her. AW told VIGIL, "Stop! Stop! That hurts!" but VIGIL continued to do it.

23. AW refers to her vagina as her "cookie."

24. While at the hospital, AW needed the restroom. While urinating, AW told CW, "Mom, it hurts! It hurts! Mom! My cookie hurts bad!" AW also told CW that it hurt when she walked.

25. When AW was done urinating, CW wiped her and noticed blood on the tissue. CW flushed the tissue down the toilet, but, prior to flushing, took a picture of the tissue with her phone.

26. While AW was at the hospital (CSVH), Sexual Assault Nurse Examiner (SANE) Corrine Luna attempted to conduct an exam on AW. Prior to conducting the exam, SANE Luna spoke to AW.

27. AW told SANE Luna that VIGIL "did it" to her. When asked what he did, AW told SANE Luna that he had touched her "private parts" with "his fingers and his private part."

28. SANE Luna asked AW, "What did he do to you with his private part?" AW responded, "He put it in. It hurt." SANE Luna later asks, "What part did he put his private part in? With one finger can you show me the part that he put it in?" AW then pointed to her butt and said, "He put it in both places. He did it two times."

29. SANE Luna was unable to conduct the examination without sedating AW as AW was in too much pain when SANE Luna attempted to examine AW's vagina. SANE Luna also informed me that she had to sedate AW as there was the possibility that AW had wounds that would need to be sutured.

30. Upon completion of the exam, SANE Examiner Luna informed me that AW had injuries to her vagina and anus that were consistent with penetration or attempted penetration. She also stated that the skin between AW's labia majora and minora was rubbed raw and was "weeping." SANE Luna also noted "gaping" in AW's anus and stated that since she has been to the hospital, she has had a lot of flatulence. In addition, she stated that AW's wounds were "very fresh."

31. Later the same day, SA Michael Marycz and I made contact with VIGIL at his residence. We then interviewed him inside of my vehicle. VIGIL was read his Miranda rights and signed an Advice of Rights form indicating that he understood his rights. The following was obtained from VIGIL's interview:

32. On this day, VIGIL had only had one beer, and was sober. He had no mental issues, did not require any medications, and was not under the influence of drugs or alcohol. The highest level of education that he had reached was "some college."

33. VIGIL stated that TW and CW had spent the night at his house, and that he had laid in bed with AW. He had passed out, and the next thing he remembered was CW coming into his room saying, "We're leaving!" He noted that CW was upset.

34. VIGIL stated that he had had beers and shots yesterday, but was "not wasted." He admitted that AW had laid in bed with him the night before, and that he was on the left side of his bed (while facing the bed) on top of the covers. He was laying on his stomach when AW came in and laid down next to him on the right side of the bed. AW put her arm around him. VIGIL then put his arm around her shoulders and went back to sleep. VIGIL stated that CW never got into bed with him or AW.

35. VIGIL stated that AW has never laid in bed with him before, and that she refers to him as "Uncle Kevin."

36. VIGIL denied ever touching AW inappropriately. During the interview, he stated, "I would never touch nobody!" and stated, "I did not touch her! I did not touch her!" multiple times.

37. VIGIL stated that his DNA would not be found in or on AW's body.

38. Early in the interview, VIGIL gave myself and SA Marycz consent to collect a sample of his DNA as well as consent to search his residence. VIGIL signed a Consent to Search form. I took samples of VIGIL's DNA with buccal swabs.

39. VIGIL then accompanied SA Marycz and myself inside of his home. While inside, he voluntarily provided the blankets that were on his bed, as well as the clothing, to include the underwear, that he stated that he had worn the night before.

40. The following day, on 02/05/2018, I collected AW's clothing that had been taken as evidence from Sgt. Gabaldon at OOTPD. This evidence, amongst other items of clothing, included a pair of purple underwear that AW had been wearing the night that the assault occurred.

41. On 02/07/2018, a child forensic interview of AW was conducted by FBI Child Forensic Interviewer (CFI) Karen Blackwell. During the interview AW disclosed that she had gone to the doctor because "something got hurt" at her "Uncle Kevin's." AW marked the vaginal area on a drawing of a child to show where she had been hurt. AW disclosed that her Uncle Kevin hurt the part that she had marked while she was asleep, had pulled down his pants, and stuck his finger in it.

42. AW then stated that they left to the doctor's, and the next time she used the bathroom, "it was bleeding." She disclosed that it hurt when she walked, stretched her legs, or when she would "duke" or "pee." She stated that she was trying to wiggle away from VIGIL and get closer to her mother while it was happening, and that VIGIL kept pulling her pants down and that she would pull them back up.

43. On 02/08/2018, I submitted the Sexual Assault Evidence Kit (SAEK) taken during the SANE, buccal swabs taken from VIGIL, AW's clothing from the night of the assault, and other evidence, to the New Mexico Department of Public Safety (NMDPS) Forensic Laboratory in Santa Fe, NM, for DNA analysis.

44. On 02/15/2018 I received the results of the analysis from the lab. The following is a partial list of the results obtained from the lab:

45. A DNA mixture of at least two individuals was obtained from evidence item 1B13D (listed as "Mons pubis/outer labia majora swabs"). AW and Kevin VIGIL cannot be eliminated as possible contributors to the DNA mixture obtained from this item. The DNA mixture obtained from item 1B13D occurs with the following probability of inclusion frequencies: African-American – 1 in

35,000 individuals; Apache – 1 in 5,100 individuals; Caucasian – 1 in 36,000 individuals; Navajo – 1 in 6,700 individuals; Southwest Hispanic – 1 in 22,000 individuals.

46. A DNA mixture of at least two individuals was obtained from item 1B2A (the purple underwear that AW was wearing the night of the assault). The major DNA profile resolved from this mixture matches the DNA profile from AW. Kevin VIGIL cannot be eliminated as a possible contributor to the DNA mixture obtained from this item. The DNA mixture obtained from item 1B2A occurs with the following probability of inclusion frequencies: African-American – 1 in 950 billion individuals; Apache – 1 in 5.6 billion individuals; Caucasian – 1 in 55 billion individuals; Navajo – 1 in 39 billion individuals, Southwest Hispanic – 1 in 41 billion individuals.

47. Writer contacted Raman Sandhu-Kirmer, the Forensic Scientist who prepared the report, for clarification of the above results. Sandhu-Kirmer explained that the above results indicated that a DNA mixture of at least two individuals, including AW and VIGIL's DNA, was found. The probabilities listed are the probabilities of finding any other, unrelated DNA in the mixture.

48. Also included in the report was the following:

49. A DNA mixture of at least two individuals was obtained from item 1B13F (listed as "Miscellaneous swabs"). Assuming AW is a contributor to this item, a foreign male DNA profile was deduced from this mixture and matches the DNA profile from Kevin VIGIL. The probability of selecting an unrelated individual at random who could be the source of this foreign DNA profile is approximately 1 in 2.7 quadrillion individuals.

50. Sandhu-Kirmer stated that 1B13F came from the Sexual Assault Evidence Kit that had been submitted to the lab, and either came from AW's breasts or her mouth/lips.

## SUMMARY

51. At the time of the incident with Kevin VIGIL on or about February 4, 2018, AW was a registered

member of the Ohkay Owingeh Pueblo. The incident occurred at 1326-B Camino Raphael, in Rio Arriba County, New Mexico, which lies within the exterior boundaries of the Ohkay Owingeh Pueblo. Kevin VIGIL is a non-Indian.

52. In view of the above facts, the affiant submits there is probable cause to believe that on or about February 04, 2018, Kevin VIGIL, a non-Indian, did knowingly sexually assault six year old AW, an Indian. The incident occurred within the District of New Mexico, in violation of Title 18, United States Code, Section 1152, Crimes in Indian Country, and Title 18 United States Code Sections 2241(c), and 2246(2)(A), Aggravated Sexual Abuse with Children.

I swear that this information is true and correct to the best of my knowledge and belief.

Respectfully submitted,

Russell S. Romero
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me this 16th day of February, 2018.

Honorable Laura Fashing
United States Magistrate Judge